5-16-0129, 5-16-0132, and 5-16-0292. All these cases are consolidated for oral argument. Court has on motion granted extended oral argument in both of these cases. It's my understanding that we have more than one counsel, at least in one of the parties. It's up to counsel to divide their time and keep track of that. Counsel for the appellant, you may proceed. Please state your name for the record. Oh, one other thing I want to be sure to say, and that is that Judge Welch is the other member of this panel. He's not here today, but he will listen to the oral arguments and read the briefs and have everything available to him and will participate in this decision. You may proceed. Thank you, Your Honor. You may please report. Counsel, my name is Mohsin Pasha, and I represent Michael and Linda Bridget. Arguing alongside me today is Mr. Brian McCarthy, who represents Mary Lou Kusmanoff. Before proceeding with the substance of my argument, I want to provide the court with a brief logistical overview of how Mr. McCarthy and I plan on splitting our time in light of the three consolidated appeals. I'll be taking the first 15 minutes. Mr. McCarthy will be taking the second 15 minutes. The three appeals do present several overlapping issues. Mr. McCarthy and I have spoken before, and we're not going to overlap issues on the argument. So, for example, both appeals raise the adjudication and stability issue. Mr. McCarthy will be arguing that, amongst other arguments that we did not raise. I will be arguing the jurisdictional issue, along with whether the trial court erred in appointing Mrs. Easterly as the guardian of Mrs. Kusmanoff's person. We raised other arguments in our briefs. I'm going to rest on my briefs for those, unless, of course, the court has any questions. We did have one question at the outset, and that is, on page 6 of the felon's brief in, I believe it's the probate case, but I'm not sure what the number is. 15P246, but it's 516.0292 on appeal. The footnote indicates that there has been filed in the trial court a petition determining the guardianship, and I just wondered the status of that. Pardon me, Your Honor, that was not my appeal. Okay, be sure to address that, Mr. McCarthy, when it's your turn. So, on our jurisdictional argument, in order for us to win, Texas must obtain jurisdiction under statutes similar to Section 203, and before the Illinois court appointed a guardian or issued a protective order. We acknowledge that, on first glance, the Texas statutory scheme and Illinois Section 203 might look different, but both sets of statutes accomplish the same purpose. The Uniform Law Commission's official comment to Section 203 states, the principal objective of Section 203 is to eliminate the possibility of dual appointments or orders. Texas, like Illinois, had procedural protection to accomplish that purpose. Texas State Code 1253-101 and 1253-102 allow a Texas court to consider the interest of justice, the best interest of the ward or proposed ward, and the convenience of the party to determine whether Texas should cede jurisdiction to another state where a subsequent guardianship petition has been filed. Those factors allow a Texas court to look at the factors in Section 203, to consider whether another state is a home state, to consider whether there has been fraud, whether there has been undue influence in bringing the ward to the state of Texas. Did the Texas court talk to the Illinois court, and what was the result of their discussions, and how many times did they talk? Your Honor, I believe Joe Rice contacted the Texas court once. I don't believe anything was accomplished in that conversation. We acknowledge that the two statutes that I just mentioned only apply to subsequently filed guardianship petitions, but another Texas statute explains why Texas can still consider prior filed guardianship petitions, like the situation here. Here, there's a present petition filed in Illinois, and a petition filed in Texas. In terms of time, wasn't the Illinois petition filed first? Yes, the Illinois petition was filed first. Wasn't there quite a considerable amount of time in between the filing of the Illinois petition and the filing of the Texas petition? That is correct, Your Honor. Wasn't that about ten months' difference? Yes, Your Honor. Does that make a difference? Your Honor, Section 209 doesn't have any sort of temporal limitation as to when another state can obtain jurisdiction. So, in light of the fact that Section 209 doesn't have such a restriction, I don't think that it makes a difference that the guardianship petition in Texas was filed ten months after the Illinois guardianship petition. So, Texas State Code 1253.151 is titled, Determination of Acquisition of Jurisdiction in this State Due to Unjustifiable Conduct. Under that statute, if a Texas court determines that it acquired jurisdiction due to unjustifiable conduct, it can decline to exercise jurisdiction or it may continue to exercise jurisdiction, but only upon considering whether another state is the more appropriate for, because of interest of justice, the best interest of the ward or proposed ward, and the convenience of the parties. So, that statute, 1253.151, allows for the situation that's been alleged here to be considered in Texas. So, the allegation here is that Mr. Kuspinoff was taking the abundance of influence from Illinois to Texas. A Texas court can consider those factors. So, all in all, through those three statutes I referenced, the Texas statutory scheme accomplishes Section 203's goal. So, the next question becomes, whether the Texas court acquired jurisdiction prior to the appointment of guardian or the issuance of protective order. Here, Texas acquired jurisdiction on February 26, 2016. That was before the Illinois court issued an order on March 4, 2016. Mr. Easterly is arguing that the appointment of a temporary guardian is enough to preclude Section 209 from taking effect, but our position is that argument would ignore the reality of temporary guardianship in Illinois and would create unintended consequences under the Uniform Act. The purpose of a temporary guardianship is to maintain the status quo until the court can determine whether a limited or plenary guardianship is necessary. Because it's designed to maintain the status quo, the procedural hurdles for obtaining a temporary guardianship are quite low. We can have a situation where Illinois is a significant connection state. A guardianship petition is filed in Illinois on Day 1. Then a temporary guardianship petition is filed on Day 2. And a temporary guardianship order is entered on Day 3. Mr. Easterly's interpretation of Section 209 is correct. That in Section 203, Subsection 2, Subpart B, Subdivision I, plain language, indicates the home state could not gain jurisdiction because of that temporary guardianship order. And we don't believe that's what the statute intends. So a temporary guardianship order is enough to divest another state of jurisdiction. Neither is a protective order initiated by temporary guardianship. Are there any cases in Illinois or in any other jurisdiction under the Uniform Act that deal with that issue of a temporary order? Whether that counts as an order under this act for jurisdiction? Not under this jurisdiction, Your Honor. We have not been able to locate a case. So here there was a temporary restraining order initiated based on the actions of temporary guardianship. We don't believe that's enough to divest Texas of jurisdiction. First is because under 755 ILCS 5-11-A-4, which governs temporary guardianship, that statute states, the temporary guardian shall have the limited powers and duties of a guardian of the person or of the estate which are specifically enumerated by court order. The temporary guardianship order here states nothing about Mrs. Easterly having the authority to institute a chancery action. So an unauthorized act cannot prevent another state from gaining jurisdiction. Additionally, if we take that factual scenario I discussed above, where Illinois would be a significant connection state, the temporary guardians would just think, well, okay, my appointment isn't enough to divest another court of jurisdiction, but let me go in and get a temporary restraining order. That'll be enough. We don't believe that's the law. All in all, the preventive status by Section 209 and the child court lack jurisdiction to enter the borders below. You're saying if the temporary order would have addressed some of these other issues, then it would have divested Texas of jurisdiction. I would not go that far, Your Honor, because I think it still goes back to my argument earlier with the factual scenario. If a temporary guardian can just go in and enter an order, that would be enough. On day two, after a guardianship petition is filed, that would be enough to divest a home state of jurisdiction. We don't think that's what the statute implies. The reason I mentioned that authorization point is just that the factual point is to what happened below. The temporary guardian didn't have any authority to enter that, to initiate a cancer reaction. I want to shift gears to the appointment of the guardian of a person. As a preliminary note, Mr. McCarthy will be discussing whether the trial court properly adjudicated Mrs. Kuzminoff as a disabled adult. If the court determines that the trial court erred, then we don't get to the guardianship issue. But even if the court holds that the trial court did not err in adjudicating Mrs. Kuzminoff as a disabled adult, Illinois state law made it clear that just because an individual is a disabled adult does not mean that that individual needs a guardian. The overwhelming focus below on the guardianship issue was whether she needed a guardianship of the estate. But the standard is different for determining whether she needed a guardian of the person. In order to appoint a guardian of the person, 755 ILCS 511A3 states, the petitioner, which would have been Ms. Easterly, has the burden of showing by clear and convincing evidence that the ward lacks sufficient understanding or capacity to make or communicate responsible decisions concerning the care of his or her person. The record here is around 2,500 to 3,000 pages long. In my review, there's only one piece of testimony that directly addresses that standard, and that was from Imogene Harrell, who was the director of nursing at St. Paul's Nursing Home, where Mrs. Kuzminoff resided in Illinois before moving to Texas. Mrs. Harrell testified that Mrs. Kuzminoff was able to communicate to the St. Paul staff what her needs were at any particular moment. That's located at C1089 in the record. Mrs. Harrell was someone who had seen Mrs. Kuzminoff day to day, and her testimony essentially concluded that Mrs. Kuzminoff did not need a guardian of the person. On redirect, we acknowledge that Mrs. Harrell said that the only exception to Mrs. Kuzminoff's ability to communicate was when she forgot that she had taken a bath. But the nursing home had a system in place to show that a bath had been taken. That one instance does not constitute clear and convincing evidence to appoint a guardian of Mrs. Kuzminoff's person. There is no other evidence in the record. In her brief, Mrs. Easterly pointed to a few other issues. So, for example, Mrs. Easterly pointed to evidence that Mrs. Kuzminoff was confused, that she had falls, that she had a poor short-term memory. But whether she suffered from those issues is not the question under the statute. The question is whether those issues prevent her from making or communicating responsible decisions concerning her care. And there was simply nothing on that in the record for those points. Mrs. Easterly also pointed to the speech therapy that Mrs. Kuzminoff was in, in the Illinois nursing home. First of all, the speech therapy took place well over a year before she was adjudicated as a disabled adult. There was no evidence that the speech therapy was designed to determine whether Mrs. Kuzminoff needed a guardian. And from our review of the speech therapy records, and I will say that the handwriting is very poor and it's difficult to read, but we don't see anything in there that says that she was inhibited from making or communicating responsible decisions concerning her care. Are you asking the court to reverse the finding of the trial court regarding the appointment of the guardian of the estate? We are, Your Honor. In our briefs, we do make that argument. The main point for that is that we believe that a third-party financial institution should have been appointed as opposed to Mrs. Easterly. Was that presented to the trial court, that request? It was briefly mentioned to the trial court, yes. Was that mentioned in a written motion or was it still at the hearing? It was not mentioned in a written motion. I believe it was mentioned by the Bridges Trial Council during closing arguments. There was, I believe at one point, a petition by Linda Burgett. Is that correct? Yes, Your Honor. Was that in Illinois or was that in Texas or both? Both. In September of 2015, in Illinois, she filed a counterpetition to be appointed as limited guardian. Was that before the final order or after? That was before the final order was entered. When ruling upon the final order, did Judge Rice take that into account and make a ruling on that petition? Yes, Your Honor. Judge Rice denied that petition because Linda Burgett did not appear for the March trial dates. Your Honor, all in all, on the appointment of guardian issue to the person, there was virtually no evidence, and certainly not clear and convincing evidence to support the appointment of Mrs. Easterly. As such, we respectfully request this court reverse the trial court decision to appoint Mrs. Easterly as Ms. Crispinoff's guardian of the person. Thank you, Your Honors. Thank you, Counsel. May it please the Court, Counsel, I'm Brian McCarthy. I represent Mary Lou Crispinoff in Appeals 516.132 and 516.292. In April 2015, when the petition to appoint a guardian was filed in St. Clair County, Mrs. Crispinoff is an 83-year-old widow. She's not previously determined to be disabled. She's not previously been appointed a guardian for her. She has two adult children, Carol Easterly, who lives in Illinois, and her son, Michael Burgett, who has long lived in Texas. In the roughly four months prior to the filing of this petition in Illinois, Mrs. Crispinoff is residing in a residential care facility in St. Clair County up to a point in February 2015 where she has a falling out with her daughter, at which time she asks her son, Michael, and his wife, Linda, to move her to Texas in order that she can live with them. And in March of 2015, that's what they do. Mrs. Crispinoff moves with their assistance to a residential care facility in St. Augustine County, Texas, and she moved her funds to bank accounts that were in Texas as well. Mrs. Crispinoff was not kidnapped. She was not held against her will in Texas. She wanted to live there. She meant to live there, and she has good reason to seek to reside there. Her need for residential care assistance while she lived in Illinois was for physical disability. She's dependent on a wheelchair for her mobility, and she had had bilateral carpal tunnel surgery in November of 2014, which left her with severely diminished use of her hands. I need to emphasize to this court that an absence of trust permeates the proceedings. Little of these proceedings below was handled by comedy or by agreement. Nearly every juncture was fraught. Nearly every aspect of this case was contested and remains so. The court had inquired about the status of the petition to terminate the adjudication of disability. That has not been ruled on in any way. There's a response to that seeking a case management conference. That's not been set. Within that petition to terminate, we asked for some relief for Mrs. Crispinoff not to have to appear in Illinois, and none of those issues have been addressed, so that simply remains pending. I think it's instructive how that's, frankly, the reason why that's pending is because we're contesting so many other things during this case. Mrs. Crispinoff's initial participation in the trial proceedings, even from the distance where she lived in Texas, left her with the belief she would not prevail, irrespective of the strength of her proof, and that the court process was unfairly disposed against her. And this mistrust on her part directly impacted how the issues were presented to the trial court. And prior to her adjudication in the trial court, this case teased to me about whether guardianship of a person was needed, and it became, in the view of our trial judge, a battle over the proper respect due to the circuit court. And in February of 2016, before the adjudication trial resumed, and it started in December of 15, when it was going to resume just prior to that, Mrs. Crispinoff sought permission from the trial court to excuse her appearance in person at trial. And when that request was denied by the trial court, she formed an absolute belief that if she returned to Illinois, she would be excused, and that she would be disallowed to return to where she wanted to reside in Texas. And at that point is when she authorizes her daughter to want to go to the courts in St. Augustine County, Texas, and to seek a guardianship over her there. And when that was done, on the filing of that, she sought dismissal of the proceedings in St. Clair County on the basis that her interests were properly before a court of competent jurisdiction. And how Judge Rice viewed Mrs. Crispinoff's efforts in Texas, how she tried to avail herself of protection there, directly informs the issue of adjudication by him here. And the context within which the court must consider Mrs. Crispinoff's appeals is that she feared for her freedom, she feared she would lose it, and she feared she'd be adjudicated even with insufficient proof, and contrary to what the law requires here in Illinois. Counsel, I know every situation is different. Okay, and I respect, you know, her longevity and decision-making in that fashion, but isn't that true about any party that has a case pending in front of an Illinois court? I mean, if they fail to appear, they're not able to present evidence, and that's just what happened in this case. Is that correct? Your Honor, I would submit to you that a guardianship case is different. Guardianship, by its nature, applies to our most vulnerable citizens, largely, but not exclusively, elderly individuals. And what we do in guardianship is different than many other cases, say, for criminal cases. We do, the law and the state, have the opportunity to determine where a person shall live, and even if it's contrary to their will, that's a very different type of cost that's paid by a litigant that chooses not to appear, opposed to somebody who doesn't appear before the court in a judgment centered against them, in which case their money is their property. So respectfully, I draw that distinction to the attention of the court. The context that I describe, her fears in this case, and in consideration of her arguments, is crucial. First, I submit that after the adjudication, we filed a motion to take judicial notice of the proceedings in the state of Texas, and we filed that in order to draw attention to the efforts that Mrs. Kuzmanoff was making, and the hopes that the court would give her a hearing on those concerns. In that motion to take judicial notice, her fears about her freedom and that the legal process was unfairly disposed against her were fully addressed. Now, Judge Rice failed to correctly consider that motion, the motion to take judicial notice, and it appears that he failed to consider it because he viewed that motion as an affront to the dignity of the court. Denying the motion, the trial court stated its belief that Mrs. Kuzmanoff was not even the person who motivated the actions in Texas. He believed that Burgett had done that. And the judge made repeated references to the lack of cooperation from the Texas court, from the judge there, and he stated that he didn't need to consider the motion because he had no basis to determine how Texas came to its conclusion. Now, the cooperation with the court in another state or how a court in another state would have arrived at its decision that Mrs. Kuzmanoff in fact had legal capacity was completely beside the point. We were not asking the court to take judicial notice of that judgment and simply accept it. We were saying take notice of the efforts that she went to to prove that she has capacity, and that's sufficient under our statute, under Section 11A, 20, and 11A and 21 of the PROA Act. That motion states a reasonable basis for Mrs. Kuzmanoff to seek termination of the adjudication made by our trial court below. The judge was obligated to conduct a hearing, if you look at the language of the statute, but he refused to hold a hearing and the judge insinuates in his ruling directly enough that it was personally offended by Mrs. Kuzmanoff looking for protection in a court somewhere else. The court more or less states in its ruling that it's not going to give a hearing on that motion that would not follow the dictates that are set forth in the PROA Act. And those PROA Act provisions, particularly those that allow for relief or termination of adjudication, are key to guaranteeing the rights of citizens that unfortunately have to go through a guardianship process, the ward, the disabled person. Because the trial court in the adjudication trial found that the burghess were asserting undue influence, he essentially ruled that he wasn't obligated to consider a motion brought by Mrs. Kuzmanoff to terminate her adjudication. Counsel, the trial court's finding apparently of undue influence, does that not stem from a financial transaction that took place when your client first moved to Texas? And that's all part of the record, is it not? Yes, sir. A substantial amount of money being transferred to her son, is that correct? $200,000. All of her estate, rough figures, yes. All of her estate was liquid except for a townhome type property in Melbourne. So, yes, all that money was transferred to the state of Texas to an account that had her son's name on it. Among accounts, they were joint owners at times of those funds. Correct. Secondly, I would submit that the handling of the adjudication itself by the trial court indicates that Mrs. Kuzmanoff was right to fear for her freedom and that the legal process would be disregarded. The trial court showed no willingness whatsoever to address the contested state of medical evidence regarding Mrs. Kuzmanoff's cognitive function and her capabilities. We have filed a motion for a directed finding and an accompanying memorandum of law that fully set forth that there was an insufficient evaluation performed by the doctor that Mrs. Easterly chose, Dr. Vest, that a proper evaluation of her had been performed by a doctor that Mrs. Kuzmanoff chose, Dr. Kim. We also drew attention to untruthful assertions made by Easterly's doctor in his report and that Dr. Vest, the Easterly's doctor, was biased. Both he and Mrs. Easterly are represented by the same law. Now, rather than address the issues in the motion for directed finding, the trial court passed over it without mention. Now, I realize that Mrs. Easterly has argued in brief that the motion was not filed by Kuzmanoff's attorney at the point it was presented just at the end of the trial. But I have fully set forth in the reply brief in Appeal 132 the trail that that motion goes from counsel to the hands of the trial judge, and there is no question that the reply brief, excuse me, there's no question that that motion for directed finding is in the trial judge's hands before he makes the decision on adjudication. Simply, the court disregarded that. The record shows that there were many references to this motion for directed finding. The judge indicated, I'm going to get to it, I'm going to get to it, and then he starts, he finishes up with the presentation of evidence, and then he starts making this determination that she's disabled. There's no reference at all at the end of the trial adjudication that the court made any ruling in any regard. And that's key. There has to be a factual basis in order that guardian be appointed over the same person. There has to be a factual basis for the disability itself. And the Probate Act proscribes or circumscribes the discretion of the trial court in that regard. It mandates that the court has to make inquiry in certain areas about the disability. And even if the trial court did not feel that it needed to rule on the motion for directed finding, that motion still acted as a roadmap or as a guide to the trial judge as to how it had to get to the adjudication issue and how it had to approach was there a sufficient prima facie case of disability in order that guardian could be appointed. So the fact that the court disregarded that motion is mirrored in the adjudication order and the comments of the judge just prior to that at the end of the trial. The fact of the matter is there is very scant evidence in the record that the judge considered all the questions that were raised about the proof for adjudication. What stands as the basis for the medical testimony by Dr. Vest was a very short in-office screening procedure administered not even in a medical office, administered in a law office, where he determined that Mrs. Kuzmanoff had a moderate cognitive decline. So she had forgetfulness. But when asked about that, when asked about the significance of that, and when asked about whether her social skills or her functional abilities was able to counteract or get around those deficits in her cognition, Dr. Vest simply said, I didn't test that. Well, the evaluation that has to be performed by a licensed physician in order to be a basis for determination of disability requires that we consider her social skills or her capacity or her functional abilities to get around whatever her disability is, be it physical or otherwise. She can be completely physically disabled and in a wheelchair. And in fact, she is not completely physically disabled, but she is in a wheelchair. But if she still has the means to express her belief about what she wants in terms of her needs, she's not disabled. And what Dr. Vest did in terms of performing his evaluation was insufficient under the statute, and what the court had to demand was insufficient under the statute. Thank you, Counselor. You'll have an opportunity for rebuttal. Thank you. Counsel for Appleby. Good morning. May it please the Court. My name is Vanessa Unsell, and I represent the Appleby. I'm going to split time with the others, Ms. Unsell. So I'm going to use the first 10 minutes. I'm going to address the jurisdictional issue as well as whether the injunctions were appropriate. But first, I think that it's worth going back over the factual basis here a little bit. Mary Lou Pesmanoff has resided in the Southern Illinois area since 1979. Carol Easterly resided in the Southern Illinois area near her mother during that time period as well. As Mary Lou Pesmanoff's health declined, Ms. Easterly provided care to her mother on a personal nature as well as care to her mother's late husband. This went on for over 20 years. The care that she provided was on a weekly, sometimes a daily basis. They had a close, loving, familiar relationship. Mr. Burkett resided in the state of Texas. His visits were rare and sporadic. In 2013, after Ms. Pesmanoff's late husband died, she sold their farm and had approximately a million dollars in liquid assets that was divided up among various bank accounts. She then moved closer into the St. Croix County to be near her daughter and their family in Tozilla. In December 2014, she was hospitalized with a UTI and influenza. Between that time period and March, December 2014 to March 2015, Mr. Burkett took approximately $750,000 of her assets and placed them into an account in his name in the state of Texas. In March, he came up to the nursing home, removed her from the nursing home, and on the way out of town stopped at two different banks and took $70,000 of her money and then deposited them into bank accounts in the state of Texas and proceeded to spend the money on repair and rehab of the house. He took Ms. Pesmanoff out of the nursing home without notifying her daughter, Carol Easterly, who had been providing care to her, who had been there on a bi-weekly basis since she had went in the nursing home in October 2014 for the bilateral problem settlement. Will the record bear out all of this in accounting? Yes, Your Honor. On April 17, 2015, after Ms. Pesmanoff had been removed a month prior by her son and taken to Texas and had not returned, Carol Easterly filed a petition for guardianship. That is the first time she had ever filed a petition for guardianship. Prior to that, she had simply been assisting her elderly mother with whatever she needed. She didn't need a guardianship. But after Mr. Burkett drained her account and left town, as she didn't know where her mother was at, she filed a petition for guardianship. She also filed a transfer case asking for a restraining order to freeze the money in the Amoco account, which she was aware of. She wasn't aware of where all of the funds were, but there was one account that had approximately $650,000, and she was aware of that, and she was able to get a restraining order freezing that money. Mr. Burkett then appeared, and in September 2015, they filed a cross-motion petition for guardianship. Then the hearing initially started in December of 2015. There was a day of testimony, and then the hearing had to be continued due to the court schedule and the schedule of counsel for Mr. Burkett and Ms. Kuzminoff. And it was continued until March of 2016. Between the initial hearing date in December and the continuation of the hearing of the trial in March, Mr. McCarthy prepared and Ms. Kuzminoff executed a quick claim deed. Even her real property in the state of Illinois was to Mr. Burkett, and he accepted that quick claim deed, even though we're in the middle of a trial on guardianship, and Carol Ainslie has been appointed to the temporary guardianship. Then four days before the trial was to resume, they go to the state of Texas and file another guardianship action. Then despite there being a 237 notice for them to appear at the hearing, none of them appeared at the hearing. The court allowed them to participate via their lawyers, but none of them appeared, and they filed a motion to dismiss for lack of jurisdiction. And that brings us to the jurisdictional argument. Jurisdiction is based on the Adult or the Uniform Adult Proceeding and Protection Act. I'm just going to refer to it as the Act. The Uniform Act? What? The Uniform Act. Texas does not have the Uniform Act. No. And this Act was put into place to prevent exactly this type of situation, where you have two courts, and Justice Rice reached out to the Texas court when he realized that we were in the middle of a trial and something had been filed out of Texas. And he said, hey, look, we've already had, there's already been evidence, there's been testimony, we're in the middle of a trial here. You know, I just wanted you to know that. Thinking that this judge would say, you know, stand down. And the Texas court didn't. They ignored him and went forward with the hearing. Now, I realize, counsel, that Texas is not part of the Uniform Act. I know under the Uniform Child Test of Jurisdiction Act, there's a provision for the courts to reach out to each other. In this Uniform Act, is there such a provision? There is a provision, but Texas does not subscribe to the Act. So, Judge Rice fulfills his duty by reaching out, but, I mean, the Texas judge essentially just ignored the communication and proceeded. You heard my question of counsel about the footnote and the status. Anything you wish to add to what he said about that? You mean on the petition? Motion to terminate that's pending. Yeah, so it's been pending and it's not been set for hearing. We've been in the process of doing discovery. It just simply hasn't occurred yet. Thank you. So, on the jurisdiction, I mean, the whole purpose of this Act is to stop this from happening. And they're now using the Act to attempt to divest an Illinois court of jurisdiction when Illinois clearly has proper jurisdiction under the Act. There's only, you know, Section 203 describes how Illinois would have jurisdiction under the Act. And it creates a hierarchy. First, it says that the home state has jurisdiction. And then it says a state with a significant connection can also have jurisdiction, but only if the home state declines to exercise jurisdiction. And then if there's no significant connection state or home states that are going to exercise jurisdiction, then another state, such as someone who's physically present in, can have jurisdiction. So, it creates this hierarchy, and there's only one home state. You can't have more than one home state. That's in the preamble of the Act. It's designed to prevent this from happening. So, but because Texas hasn't adopted the Act, it doesn't really work because Texas isn't required to abide by Section 203. So, there is another section of the Act, which is Section 209. And Section 209 states, if a court in this state has jurisdiction under Section 203, which we did, it may proceed with the case unless the court in another state acquires jurisdiction under provisions similar to Section 203 before the appointment or issuance of the order. So, then the question becomes, did Texas acquire jurisdiction under provisions similar to 203? And the answer is absolutely not, because if Texas had Section 203, we wouldn't be here because they would have been a significant connection state, not a home state, and they would have had a defined jurisdiction unless Illinois chose not to exercise jurisdiction. So, what Texas does have is Texas has a statute which allows someone, if they're just physically present in the state, that's all that it requires for a guardianship. They don't even have to, the Texas court doesn't ask how long they've lived there. It doesn't ask what their connections are to the state. If they're physically present in the state, it's appropriate for a petition for guardianship. So, I don't know how that can be substantially similar or similar at all to Section 203, which creates this hierarchy where you don't have multiple states who are proposing the exact same guardianship action over the same ward. Additionally, because Texas only requires the presence at the time of filing, they do have a section that deals with multi-state proceedings, and that's 1253-101. But all that says is it says Texas may delay further action when a subsequent action is filed in the first foreign jurisdiction. Well, that doesn't even apply here because the Illinois case had been filed almost entirely here  So, I mean, the Texas action is in no way similar to 203. I mean, it doesn't even serve the same purpose. And all it says is that they may decline jurisdiction. Not that they must decline or they must defer to another state. It simply gives them the option to decline jurisdiction. Counsel, what about the telecounsel's argument that this was only a temporary order that was in place and, therefore, Texas courts filed the best Illinois court jurisdiction? So, to the best Illinois jurisdiction, you have to have two things. There has to be both Texas has to have the same jurisdiction under substantially similar provisions. That's the first part, which I was just addressing. And then it also has to have been done before the issuance of an order. And, unfortunately, there's been no Illinois case law on Section 209 and what a quote-unquote order refers to in that statute. I mean, it's just not been addressed. You heard me ask about whether there's any other state under the Uniform Act that's interpreted that. And, no, I mean, the Uniform Act is pretty new. I mean, it's within, you know, the last five, six years. So, in my research, I was unable to find that either. So, but, so it says, I mean, the Act uses the term order. So, I mean, I don't know. There were several orders in this case. There was a temporary guardianship, which was ordered. And there were also protective orders that were in there freezing this money. I mean, it seems to me that the purpose of this statute is not for one court to start adjudicating the matter and then for them to be filed in another court. So, if that's the purpose of the statute, then it's absolutely served by treating an order as a temporary guardianship order or a protective order freezing assets of the estate. And so, I think that it's clear that neither did they fulfill either aspect of Section 209, which is there were two substantially similar provisions in Texas, and they did not obtain jurisdiction prior to the issuance of an order in this case. And, therefore, the filing of the Act in Texas does not say that it's held in the court of jurisdiction. Thank you. Good morning, Your Honors. I'm Jane Helgel, and I represent the athlete, Carol Easterly, also. I want to address just a couple of things back before I get started. Samantha laid out pretty distinctly the money that were taken by Mr. Burgett prior to the time that his mother was taken to Texas. And I want to just address a couple of things that Mr. McCarthy said in his argument. He said to you that Mrs. Kuzminoff wanted to go to Texas, and she moved her money to Texas. And I think, Your Honors, if you will take a close look at the record in this case, and I'll refer you to record C-602-614. That was a recording that was the Amoco Credit Union recording. Apparently, once Carol Easterly found out that Michael Burgett had put his name on a $315,000 account, she told her mother about it, and her mother said, Oh, no, I set that account up on the Amoco Credit Union, and only my name was supposed to be on it. And so Carol said, well, let's call Amoco. Let's make sure that that's what's going on. And this is a recording at that point in the record in which Mrs. Kuzminoff made the statement to the Amoco person who answered the phone, I didn't want my son's name on that account. That was supposed to be in my name only. When did that conversation happen? That was for January 29th of 2015. Now, on January 29th of 2015, Mr. Burgett did a couple of things. He transferred that very day after that conversation, he transferred that $315,000 into his Amoco account. And in addition, he forged his mother's name on a check for one of her Illinois banks for $315,000, and he deposited that in his Amoco credit account. So to say that Mrs. Kuzminoff moved her money to Texas absolutely is not supported by the record. So I think it's important to make a list of those recordings and have the opportunity. You can see that she expressed a complete surprise. She wanted just her name on that account. So in terms of how this case came to be filed, my client realized her mother's money had been taken. She was penniless. She had nothing to her name. She was deposited in a nursing home down in Texas, and at that point she believed it was her job, because of the long history of taking care of her mother, to file for guardianship and to freeze those monies. And luckily, Amoco had a presence here in the state of Illinois, and we were able to do that. So but for paralegal history's sake, her actions in this case, all of the slaves' monies would be in her son's account. Now, of course, you'll hear from the other side, oh, well, she wanted them over there. I think the recording proves that completely false. Secondly, they'll say, oh, well, he was going to hold them for her. But if you take a look at his personal bank account at East Texas, First National Bank of East Texas, he put about $74,000 in there that he picked up as he went out of town. And he began using that money for things for his new home, loans and for things that he was buying for a cabinet. He bought him a cabinet top. There's a whole bunch of these things that were used for his home. So just to be clear, this is why my client was not paid back. We've actually filed a citation to recover assets in the trial court to get that money back, because we have had to check. We know he spent it on himself and not on her. So that's the backdrop of how this case was brought. And I wanted to make you aware of that before I went into some of the arguments. The first argument that Mr. McCarthy brought before you was his argument in the 0292 case, where he filed a motion to take judicial notice of a Texas order and asked the court to, well, actually the title of that pleading is a motion to take judicial notice of a Texas court order and to terminate an adjudication of disability. So the title of the pleading doesn't really say we want you to construe this order as a request for termination, which is what the body of the pleading said. Basically, what the court was replying to was we're wanting you to take judicial notice. Now, Mr. McCarthy found fault with Judge Rice when he said, I think that Judge Rice got upset because he felt it was a personal affront. I don't think Judge Rice thought it was a personal affront. He could not understand why the Texas court continued to take jurisdiction over this case when it was clearly in his courtroom. But he did not take a personal affront. I believe when he made his ruling in this case, he essentially was saying, I'm not taking judicial notice of a void Texas order. I am drawing the parties from going back to Texas. I believe I have jurisdiction, so if I take judicial notice of this order, what does that say about my jurisdiction here? And he believed he had jurisdiction. And in addition, that Texas order actually ordered my client to return the money to Mrs. Kuzminoff. Now, what would happen then? I've got a Texas or an Illinois court saying we're taking judicial notice of this order that says Carol Easterly had the state send all this money back to Mrs. Kuzminoff. That absolutely would have gotten rid of every protection that this guardianship had provided for this lady. And in addition, I can tell you that in the records you'll see that Mr. McCarthy actually attempted to domesticate that judgment about ten days earlier. He filed a petition to register the order as a foreign judgment. What happened then, I had to file an emergency motion so the court wouldn't register it as a foreign judgment because it ordered my client to give all this money back to Mrs. Kuzminoff. Now, quite honestly, Mr. McCarthy is correct. The case has been fought with arguments all the way through. But this is what I personally couldn't understand. The probate court allowed Mr. McCarthy to just hold a file, a petition to terminate it. It has to be just a request from Mrs. Kuzminoff to terminate the guardianship. He could do it at any time after identification of disability. You don't have to attach a foreign order that the court has already determined was foreign because the Texas court had no jurisdiction. All you had to do was do a three-page, a three-line petition that said, I want to determine that I believe I'm competent. It wasn't done here. What was the date of that? When he filed the petition, it was like the April the 16th. It could have been only a month and like three days after the initial adjudication. Okay, so the footnote I asked you about was actually a second petition. Exactly what the probate court allowed him to do, request to terminate. And I know the court has to see that, and we will for the record object that it wasn't before the trial court when this decision was made, so it technically shouldn't be considered, perhaps only for your purposes to illustrate there is a way to do this, and very simply, it's a request to terminate. It's not a really big issue at all. And I think that's the operative word there is request to terminate. That type of court order couldn't be construed as a request to terminate. It was a judge down there saying she's okay, essentially. So I think the court was correct in not allowing that motion, and as I said, it could have been very simply easily done without using a lot of these big thumbs by just filing a three-line petition, petition to terminate. The next point I'd like to address is Mr. McCarthy, in his briefs, suggested that he had filed this motion for directive finding. And it may not be clear to the court, but when we came back in March, on March the 1st, Mr. McCarthy represented his client even though she wasn't there. But on the second day of trial, March the 2nd, Mr. McCarthy came back, and during my case in chief, he began to argue that there was no evidence in the record that his client was disabled. Well, of course, we had evidence deposition, which we hadn't offered at that point. So we did offer it, and then Mr. McCarthy said, oh, what I'd like to do is I would like to now offer my evidence deposition to my expert and have the court consider both of these and then issue a directive finding indicating that she's not made a prime patient case. Well, if obviously I'm entitled to put on my entire case before the court issues a ruling on whether or not I have put on a prime patient case, I'm in the process of doing that, and we can call my client to testify who had information about her mother's medical situation also. So at that point, and I want to make sure that it's clear to the court, I put that to the record because Mr. McCarthy's brief unambiguously says that he filed that brief and motion when he offered his doctor a Tim's evidence deposition. And if you look at the record three, page 26-29, when he offered an original to the court, which is what his brief says was in fact this motion for directive finding, it was. That was the original Dr. Tim's deposition. If you look further at the record of R5, page 222 and 223, Mr. Cranley, the counsel for the Burgett's, tries to start arguing his motion, and I raised my hand and said, wait, I don't think that's been filed. Okay, wait a minute, I'm a little bit confused here. There was another lawyer at that point? That represented the Burgett's. Okay, okay. So Mr. McCarthy comes in. Mr. McCarthy represented his cousin's daughter. Okay. And so news of the second case filed in March, and then he said, I'm withdrawing, Your Honor. I'm terminating my representation. She's fired me. Basically, I want to withdraw from the case. So that afternoon, he wasn't in the case at all. And of course, Judge Rice, who bent over backwards in this case, Your Honors, in order to give his cousin off a voice in this thing. I can't tell you how many times he's been saying, she is to be protected by this court, so now we're going to make sure that we hear her voice. And when she didn't show up, he let her counsel represent her without her even being there. So at any rate, she fired him, essentially, noon of the last day of trial. The motion for direct defiance hadn't been filed. And in the record, Mr. McCarthy admits it at page 232. I said, where has this brief been filed? And Mr. McCarthy said, records was made today with the contention of this court taking those things under. It's here, but, and I said, it's not been filed. And he said, no, it's not been filed. So Mr. McCarthy never filed a motion for direct defiance. Later, Mr. Cranley, the other lawyer, admits that he never filed it. The only person who argued that motion for direct defiance was Mr. Cranley, who represented the Borghese. And the court, there's been a lot of judge rights that take a lot of flack about how he handled this correctly, didn't read the motion. The motion was for a direct defiance written to the end of evidence that Mr. Cranley handed to the court, and they take fault with the fact that the judge doesn't stop and read the entire motion. You know, I've tried numerous cases, and I can guarantee you when I'm looking for a direct defiance in a jury case, usually the court takes my written motion, but then rules without any further necessarily reading of the motion. This is the reason that the court had to read this motion. He let Cranley argue. Mr. Cranley laid it all out. But then, rather than asking for an order on a direct defiance, Mr. Cranley morphed it over to a cloning argument and tried to put on evidence. And under 735 ILCS 5-2-110, if the defendant presented evidence after his motion for direct defiance, he waived that claim that the trial court aired. So, either Mr. Cranley presented evidence and waived the direct defiance order, because the judge right told him, I've heard all the evidence, I really, before I make your motion, and Mr. Cranley said, I understand, Your Honor, I understand, and when he had to make the motion, then he starts putting on evidence, essentially. He calls to examine the GAF. So, I believe he waived his motion for direct defiance, and if he didn't waive it under that section, he never asked the judge to rule on it. He just made his cloning argument, said, I rest, and that's it. And the judge didn't ask him, is there more, Mr. Cranley, than he said no. So, I believe on both those issues, the judge billed the backers hearing a motion Mr. McCarthy wrote, which was no longer in the case, allowing another lawyer to argue it, and giving him every chance to make every argument he wanted to make. Now, I want to get to the issue relative to the adjudication of disability, because I know I'm running out of time, and I talk a little bit fast. But, in the adjudication of disability, it's a manifest way of the evidence. And, obviously, you know exactly what that means. It's a high burden. It's a high burden, very high burden. This court is not, under the page law, supposed to start looking at the credibility of witnesses, weighing evidence. You leave that to the trial court. And, essentially, if you read the two briefs of both of the appellants, that's what they're doing. They're saying, the court put too much weight on this evidence. The court didn't put enough weight on that evidence. Dr. Cusk wasn't credible. Our guy was better. That's their entire argument, and I don't think the court can do that. If there's anything in this record that supports this lady was adjudicated with, was disabled, the court is bound to go with the trial court's decision. And, I believe, if you will read Dr. Vest's evidence, as you will agree with me, that there's definitely evidence that she was, in fact, disabled. He performed testing on her. He diagnosed her with moderate dementia. He found that she had short-term memory loss. Even their doctor said she had short-term memory loss. But they want you to weigh these two doctors and know if that's the court's function. Now, with regard to Dr. Vest, they do bring two arguments. They say he's biased. And I got that. We had Dr. Vest do the examination of Mrs. Cousenoff. We knew that in the past his son had been represented by my daughter's office. We knew that he'd been represented in the past by my daughter's office. But we took that chance. We thought he was a physician in the city of Belleville who was well-respected. We knew he'd been involved in guardianships. We knew that he would make a nice appearance, that he would examine correctly, and we chose him. Now, so I understand their argument. You can always be biased. But, as I said, that's not what this court's function is here. So, I take issue with them calling him untruthful. They suggest his whole testimony was untruthful because he gave him a test. It was called a MOCA test. And in that test, he was asked to have the disabled adult, alleged disabled adult, draw a clock. And so, without the testing result in front of him, he was asked, well, what was wrong with the clock? And he said, well, I don't have it in front of me, but I believe that the numbers were hard to read. He said, come away from the clock. I believe some of the numbers weren't completely inside the clock. And so, they actually requested this document, which is a test result. And when you take a look at it, and I blew it up, and initially I thought when I first looked at it, it was a small one, I said, well, you know, quite honestly, the clock isn't going, and the numbers are difficult to read. And if you all appear to be inside, perhaps that was a mistake on his part. But when you enlarge the clock, you can see that what Mrs. Kuzma did is she made a circle, and she had a couple of parameters on this side. She actually started to go up here for her lower parameter, which went through the numbers. So, without that said, without this in front of him, that he believed that some of the numbers were outside the circle, I believe it was a valid argument that they potentially were outside the circle. But my point is simply this. Both sides argue he's unprincipled. He's completely unprincipled. He's always testifying because he made this assertion about this clock, which I think is absolutely ludicrous. I think that there's evidence that this lady does need a guardian on her first date, but that's not the focus of this case. She also needs a guardianship of her person, and she does need a guardianship of her person because Dr. Vest testified because of her short-term memory and confusion. She can't remember if she ate breakfast. She can't remember if she took her medication. She can't remember if she bathed herself. So, there is evidence in this record that this lady cannot make reasonable decisions about the care of her person and communicate them to others. There's a plethora of evidence, and I agree, from the nursing home where she was located at St. Paul, where she had significant bouts of confusion in January and February of 2015. And during those bouts of confusion, at one point she thought the clock was off the wall and it was still there. She couldn't remember she had physical therapy. She couldn't remember sometimes that they blocked her meals. So, contrary to the assertion of counsel, there's certainly evidence in this case that, number one, she needs a guardian, someone to truly protect her and her assets. She needs a financial guardian. And number two, that she needs someone who can assist her with her personal things that she needs to be assisted with. And that directly goes to her short-term memory. Now, as I said, counsel has, and I want to just finish up on this point, counsel has argued that their doctor, Dr. Kim, is much better qualified. He's a board-certified geriatric, and he's a national qualified. Thank you, counsel. Thank you. The above? Yes, Your Honor, I'm going to reserve a few minutes for Mr. Pasha to make his final argument as well. I believe we only have eight. Correct, Your Honor. Thank you. Your Honor, we have suggested in brief and in my comments to the court in the argument here that Carol Easterly did not make a prime inpatient case with regard to adjudication. If the question is whether there is sufficient evidence to make out a prime inpatient case for adjudication, which allows for the court to appoint a guardian, this court's review actually is de novo. That's the argument that's made in our brief. And in fact, we saw part of a de novo presentation of evidence here. I've never yet seen in the trial proceedings that Dr. Vest's results sheet was blown up so that the court could see what was going on. Frankly, that's the problem that ought to be at the essence of what this court does, since Guzman was entitled to it, to have a court in Illinois at least take a first look at the issues raised in the motion for directed finding. What about the issue of waiver? Well, it would have to be demonstrated that she knowingly waived the issue. And the court below understood that the motion for directed finding was in front of our judge below appointing me the adjudication. And when we supplemented the record in this court, we had obtained the consent of counsel to present that with the understanding that that was, in fact, in the record at the time we described. Now, just so that this court is in perfect understanding, the original of my motion for directed finding and the attached memorandum filed at what was supposed to be filed at the same time was given to the court clerk. And for whatever reason, when we later were looking at the record as if we got it back from the clerk in the trial court, it simply wasn't there. And that's the point at which we called attention to that to our trial court by motion, indicated that we believed it had been filed, had been handed to the clerk, that it wasn't in the record. And that's, frankly, the basis for at least our concern that it was sitting on the trial desk or sitting at the clerk's desk and simply not given to the judge, not included by the judge, not considered by the judge. With regard to Dr. Vest and the blowup of the score sheet, I only want to draw the attention to the fact that that's a one-page screening tool that's used to determine if somebody has, on a particular day, some cognitive decline. Only three of those answers require a person being administered that test to give it to the individual who's being tested and to write directly on the test. We drew attention to one of the three answers that we could see. The balance of this blank, because apparently Dr. Vest scored that some other way. But of the three responses that my client made, one of the three the doctor testified to and said she didn't perform it well for the reasons that were explained, and she scored only one out of five points on that section for which three questions were demonstrated on the test result. One of those three, we make the point, the doctor just got wrong. So one out of three of his questions that he assessed her to have a cognitive decline on a full screening tool, one-page test, done in the lawyer's office, he got wrong. I thought that's significant. I believe that's significant. In any case, that would be something we would draw attention to. What is different about this case than just a simple case? The judge gives a lot of evidence. The judge's discretion is circumscribed. Section 11A11 of the Probate Act says, after hearing, the court shall inquire regarding, and then it goes into a list of things, the nature and extent of the respondent's general intellectual and physical functioning, the understanding and capacity of the respondent to make and communicate decisions. The impact of disability on respondent's functioning and basic activities of daily living. Those are irrespective of whether a motion for directed finding is filed or not. That is the obligation of the trial court that is not demonstrated here. It did not occur. And with that, I reserve the balance of time. Thank you, Your Honors. On the jurisdictional issue, we acknowledge that the Texas statute is discretionary. We acknowledge that it allows for presence during jurisdiction, and we acknowledge that it doesn't have a homestead hierarchy. But our point is that the two statutes accomplish the same goal. The fact that Texas does not have the Uniform Act, we don't think that that's terminative because the statutes only need to be similar. On the undue influence issue, we question the trial judge's conclusion on that. The trial judge didn't hear from Mary Ruth Kusmanoff, didn't hear from Brigette. Yes, he heard evidence that she was susceptible. Yes, she heard evidence. Yes, he heard evidence on the money transfers. But we also point to that we cited in our brief evidence that Mr. Brigette said that Mrs. Kusmanoff asked him to conduct those transfers. So we don't believe the trial judge had a basis to conclude that. That's a credibility determination, is it not? It is, Your Honor. We ask that this court reverse. Thank you. Thank you, Counsel. The court will take this matter under advisement and issue a decision in due course. The court will stand in recess and take up the last two cases of the morning. Thank you. Court adjourned.